UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
                                    :
JUSTIN R., by his mother SYLVIA O'TOOLE, :
                                    :
                    Plaintiff,      :
                                    :        06 Civ. 6228
                                    :        (BSJ)(RLE)
            v.                      :
                                    :
                                    :        **Opinion and Order**
LUZ BLOISE, et al.,                 :
                                    :
                    Defendants.     :
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/6/11

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Plaintiff Justin R. ("Plaintiff"), by his mother Sylvia O'Toole, brings this lawsuit against the City of New York (the "City"); its employees Taquiyya Niang ("Niang"), Cassandra Greene ("Greene"), and James Stewart ("Stewart"), in their individual and professional capacities; St. Christopher's Inc. ("St. Christopher's"); and its employees Luz Bloise ("Bloise"), Angela Smith, Grace Borrero, Nicola Hammond, and "Jane Doe," in their individual and professional capacities, for failure to supervise and protect pursuant to 42 U.S.C. § 1983 and U.S. CONST. amend. XIV, failure to train pursuant to 42 U.S.C. § 1983 and U.S. CONST. amend. XIV, acquiescence in the use of excessive force pursuant to 42 U.S.C. § 1983 and U.S. CONST. amends. IV, XIV, failure to supervise pursuant to New York common law, breach of contract pursuant to New York common law, and breach

of obligation to carry out social work duties pursuant to New York common law.

It is undisputed that Plaintiff was subject to physical abuse while he was a foster child in the City's care and custody.  Although there are no facts in the record as to the specific dates on which the abuse occurred, it is undisputed that the abuse occurred in a foster home under the supervision of St. Christopher's.  St. Christopher's and the City contracted for St. Christopher's to provide foster care services to children in the City's child welfare system, but the City maintained ultimate responsibility for Plaintiff and all the children in its legal custody.  Plaintiff has settled his claims with St. Christopher's and its employees and has obtained a default judgment against Niang.  Plaintiff now moves for summary judgment against the City, Stewart, and Greene (collectively, the "Defendants") pursuant to Federal Rule of Civil Procedure 56, and Defendants have cross-moved for summary judgment against Plaintiff pursuant to Federal Rule of Civil Procedure 56.

For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

## STATEMENT OF FACTS

Before commencing with its statement of facts, the Court notes that its timeline of relevant events was derived not only

2

from the papers submitted by the parties, but from an exhaustive
review of the record itself.  The Court's review of the
underlying documents was necessitated by the deficiency of the
Rule 56.1 statements submitted by both parties.  Both parties'
56.1 statements were insufficient in content and citations.  Due
to these limitations, the Court has cited directly to pages from
the parties' exhibits.  The Court has also noted where the
record is devoid of and/or lacking in facts which speak to a
particular issue.

Plaintiff was born July 10, 1995.  Def.'s Rule 56.1 Stmt.
("Def.'s 56.1") ¶ 1; Pl.'s Response Def.'s Rule 56.1 Stmt. Summ.
Facts ("Pl.'s 56.1") ¶ 1.  Two years prior to Plaintiff's birth,
however, Plaintiff's parents became known to the City's
Administration for Children's Services ("ACS").  Def.'s Mot.
Summ. J. Ex. K p. A01488.  The events related to the present
action first transpired in the spring of 1999, when Plaintiff
was almost four years old.  At that time, Plaintiff's  parents
began receiving preventive services from authorized contract
agency Cardinal McCloskey.[1]  Def.'s 56.1 ¶¶ 3-4; Pl.'s 56.1 ¶¶ 3-
4.  As a result of the family's case with Cardinal McCloskey,
Plaintiff's case file was transferred within ACS from the

---

[1] Neither party has provided the Court with any facts regarding the dates on
which each of the individual defendants became involved with Plaintiff's
case.  The Court notes, however, that a petition filed with the Family Court
on June 25, 1999 states that Niang was the "ACS caseworker" on or about March
19, 1999. Def.'s Mot. Summ. J. Ex. K p. A00129.

Division of Child Protection ("DCP") to the Office of Contract
Agency Case Management ("OCACM"). Def.'s 56.1 ¶ 5; Pl.'s 56.1 ¶
5. DCP was the division of ACS responsible for investigating
reports of child abuse and neglect transmitted from the State
Central Registry ("SCR") child abuse hotline. Pl.'s 56.1 ¶¶ 49-
50; Def.'s Reply Rule 56.1 Stmt. ("Def.'s Reply 56.1") ¶¶ 49-50.
OCACM, also known as the Office of Contract Management ("OCM"),
was the unit of ACS primarily responsible for supervising
contract agencies which were providing foster care to children.
Pl.'s 56.1 ¶ 56; Def.'s Reply 56.1 ¶ 56. DCP and OCACM were
each in separate divisions of ACS. Pl.'s 56.1 ¶ 57; Def.'s
Reply Rule 56.1 Stmt. ¶ 57.

Several months after the Plaintiff's family began receiving
services from Cardinal McCloskey, a report regarding the family
was made by a school official on May 21, 1999 to the State
Central Registry ("SCR") child abuse hotline. Def.'s Mot. Summ.
J. Ex. K p. A00086. The report alleged that one of the
Plaintiff's siblings had missed 32 days of school. Id. As a
result of this report to the SCR, DCP commenced a child
protective investigation.[2] Def.'s Mot. Summ. J. Ex. K pp.
A00086-91. A month after the May report was received, an
additional report alleging child neglect by Plaintiff's parents

_____

[2] The record does not contain any facts regarding who within DCP conducted the
investigation stemming from the May 21st SCR report.

4

was received by DCP on June 16, 1999.[3]  Def.'s Mot. Summ. J. Ex.

K p. A00048.  The allegations in the June 16th report were that

"the parents are indulging in illicit substances and alcohol

which is affecting the care of the children."  Id.

DCP removed the Plaintiff and his siblings from his

parents' care on an emergency basis on June 23, 1999.[4]  Def.'s

56.1 ¶ 8; Pl.'s 56.1 ¶ 8.  Following the removal, the Plaintiff

was placed in a foster home under the supervision of St.

Christopher's.  Def.'s 56.1 ¶¶ 8-9; Pl.'s 56.1 ¶¶ 8-9.

Bloise, the assigned caseworker from St. Christopher's,

conducted an initial visit to the foster home on June 24, 1999.

Def.'s Mot. Summ. J. Ex. K pp. A00461-2.  Bloise's notes from

the visit state that she "checked the home and found it

appropriate for child living there," and that "the child is

getting along with her [foster mother's] children."  Def.'s Mot.

Summ. J. Ex. K pp. A00462.  The record is silent regarding how

Bloise's June 25, 1999 note or any of St. Christopher's

subsequent case notes became a part of Plaintiff's case file.

Nor does the record reveal any facts regarding who within ACS

---

[3] As with the May 21st SCR report, there are no facts in the record regarding
who within DCP conducted the investigation stemming from the June 16th SCR
report.  The record is similarly silent as to the source of the June 16, 1999
SCR report.

[4] The record is devoid of any facts regarding who within DCP conducted the
removal of Plaintiff from his parents' home.  The Court notes, however, that
a document labeled "Emergency Services/Pre-Placement Service Placement
Information" lists Niang as both the "F.O. [field office] Caseworker" and
"Transportation Worker."  Def.'s Mot. Summ. J. Ex. K pp. A00131.

had access to these case notes at any time.  Finally, although
Defendants have provided the Court with voluminous manuals for
the "Division of Adoption and Foster Care Services" and the
"Child Protective Field Services Operations," Def.'s Mot. Summ.
J. Ex. Q and X, neither party has directed the Court to any
facts regarding ACS' policy or practice for the review or use of
such foster care agency case notes.

On June 25, 1999, Niang, as an employee of ACS, filed an
Article X neglect petition against the Plaintiff's parents in
Family Court.[5]  Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 8; Def.'s Mot.
Summ. J. Ex. K p. A00126.  The Court approved the petition that
same day and ordered that Plaintiff and his siblings be placed
in the care and custody of the Commissioner of ACS.  Id.

On June 29, 1999, DCP staff, Cardinal McCloskey staff, and
Plaintiff's father and grandmother attended a 72-hour Child
Safety Conference.  Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20; and
Def.'s Mot. Summ. J. Ex. K pp. A00073.  The DCP staff in
attendance were Niang, Greene, and Stewart.  Def.'s 56.1 ¶ 21;
Pl.'s 56.1 ¶ 21.  During the conference, the participants
discussed the circumstances leading to the removal of the

_____

[5] Although neither party has provided any guidance to the Court on this issue,
the Court takes judicial notice that Article X of the Family Court Act is the
state statute which governs child protective Family Court proceedings in New
York.  Under Article X, a child protective agency may file (and the Family
Court may grant) a petition alleging child abuse or neglect.  In addition to
alleging abuse and/or neglect, the agency's petition may also request that
the Family Court place the child in the custody of the Commissioner of the
local social services agency. See N.Y. FAMILY COURT ACT § 1046 (2011).

children and a proposed plan for moving forward. Def.'s Mot.
Summ. J. Ex. K pp. A00073-4; Def.'s Reply Rule 56.1 Stmt.
("Def.'s Reply 56.1") ¶ 78. As with the foster care agency's
case notes, the record is devoid of any facts regarding how the
materials associated with the June 29th conference became a part
of Plaintiff's case file. The record also lacks any facts
regarding who within ACS had access to these materials at any
time. Finally, the parties have failed to direct the Court to
any facts that describe the agency's policy and practice for the
review or use of such conference materials.

On July 8, 1999, Niang recorded a handwritten note on a
"Case Stat Sheet" for the Plaintiff's case that "7/6/99 case to
be combined with previous case sent to OCM 945 (ACTIVE)." DCP.
Def.'s Mot. Summ. J. Ex. K pp. A00025. Several days later, on
July 12, 1999, a request was made on Plaintiff's case to "comb
w. act. case."[6] DCP. Def.'s Mot. Summ. J. Ex. K pp. A00001.

Relying on Stewart's deposition testimony, Plaintiff
alleges that the July 12, 1999 entry reflects a request made by
DCP to begin a clerical transfer of Plaintiff's foster care case
from DCP to OCACM on that date. Pl.'s 56.1 ¶ 78. Seen in this
light, the July 12, 1999 entry would appear to support
Plaintiff's claim that transfers from DCP to OCACM typically

---

[6] The handwritten note is unclear as to who within DCP made this July 12, 1999
request, and the parties have provided the Court with no further guidance on
this issue.

took up to 90 days. Defendants disagree with Plaintiff's reading of the July 12, 1999 record and instead allege that the July 8th and July 12th entries reflect a request, initiated by Niang on July 8th, to administratively combine on July 12th the files associated with Plaintiff's Cardinal McCloskey services case with the files from the active DCP investigation. Def.'s Reply 56.1 ¶ 78. Although Defendants have not provided the Court with an alternative date on which DCP made a request to transfer, Defendants argue that Plaintiff's interpretation misreads the record. Id.[7]

The record indicates that on July 12, 1999, Plaintiff had a visit with his mother and grandmother at the foster care agency. Def.'s Mot. Summ. J. Ex. K pp. A00459-60. The case notes for the visit state that Plaintiff "started to cry a lot" when he saw that he had to leave "because he wanted his BM [birth mother]."[8] Def.'s Mot. Summ. J. Ex. K pp. A00460.

Following the July 12th visit, the next entry in the St. Christopher's case notes is a documented attempted visit to the Plaintiff at the foster home on July 19, 1999. Def.'s Mot.

---

[7] The Court notes that Defendants' explanation appears more consistent with the handwritten notes in the record. Since the Court's opinion assumes Plaintiff's claim that the file was not received until September 21, 1999, however, this disputed fact does not impact the Court's decision.
[8] As with Bloise's case notes from the initial June 24, 1999 visit to the foster home, nothing in the record indicates how the July 12, 1999 case note entered Plaintiff's case file. The record similarly lacks any facts regarding: (1) who within ACS had access to this case note at any time; and (2) ACS' policy and practice for the use of such notes.

Summ. J. Ex. K pp. A00463-4.  The case notes regarding this

visit indicate that "there was no answer" at the door and

Bloise, the St. Christopher's caseworker, "left a note" for the

foster mother.[9]  Id.

On July 29, 1999, ACS employee, Betty Herman ("Herman"),

prepared a Child Evaluation of Plaintiff based on contact with

St. Christopher's.[10]  Def.'s Mot. Summ. J. Ex. K p. A00028-42.

The Child Evaluation stated that Plaintiff was a "healthy 4 year

old child. . . . There are no significant medical issues to

report. . . . There are no behavior problems to report. . . .

The case manager reports that Justin[] is doing well in the

foster home."  Def.'s Mot. Summ. J. Ex. K p. A00034.  The box

stating that "[t]he child's current placement is the best

available and most appropriate to meet his/her needs" was

checked.  Id. at A00041.  As with St. Christopher's case notes

and the materials related to the 72-hour conference, there are

no facts in the record regarding how Herman's Child Evaluation

became a part of the Plaintiff's case file once it was

completed, nor does the record contain any facts regarding who

within ACS had access to the Child Evaluation at any time.  The

---

[9] The Court's findings in footnote 11 relating to facts missing from the
record apply equally to the notes associated with St. Christopher's attempted
visit on July 12, 1999.

[10] Plaintiff disputes whether the contact between Herman and St. Christopher's
ever occurred, as Bloise testified in her deposition that she had no contact
with ACS. Pl.'s 56.1 ¶ 31.  The parties are in agreement, however, that the
Child Evaluation was prepared. Def.'s 56.1 ¶ 32; Pl.'s 56.1 ¶ 31.  Plaintiff
has not named Herman as an individual defendant in this case.

parties have also failed to provide the Court with any guidance on the agency's policy or practice for reviewing and utilizing such child evaluations.[11]

On July 30, 1999, the day after the Child Evaluation was completed, St. Christopher's submitted its Uniform Case Report ("UCR") to ACS. Def.'s Mot. Summ. J. Ex. K p. A00438-57. The UCR states, "Justin is [a] 4 year[] old boy who does not show any behavioral problems. . . . Justin is a very healthy young boy." Id. at A00443. The boxes stating "No significant behavior problems," "Healthy and no obvious physical illness, disability or lack of physical development," and "No identifiable mental/emotional disturbance or development delay" were all checked. Id. The UCR also notes that "there is not enough information about" the case because it "is new to this agency." Id. at A00439. Although the parties agree that St. Christopher's "submitted a UCR to ACS", the record is silent as to which unit in ACS received Plaintiff's UCR and who, if anyone, reviewed it upon receipt. Def.'s 56.1 ¶ 33; Pl.'s 56.1 ¶ 32. The parties have also not provided any guidance to the

---

[11] Defendants have provided the Court with a 158-page document entitled "Child Evaluations in Foster Care," Def.'s Mot. Summ. J. Ex. S., but they have not directed the Court to any specific language within the document that supports their defense. Plaintiffs note that this document "does not provide any policy, procedure or standard for which division of ACS is responsible for monitoring the foster care agency prior to the transfer of the case to OCACM," but they decline to direct the Court to any portions of the document which otherwise speak to ACS' responsibilities or practices with respect to Child Evaluations. Pl.'s 56.1 ¶ 69.

Court regarding ACS' policy and practice for the use or review

of UCRs.[12]

The record indicates that on August 3, 1999, a request was

made by DCP to transfer the Plaintiff's case to OCACM.  Id. at

A00016-7.  It also indicates that the case was delivered to

"OCACM 99X" on August 6, 1999.[13]  Id. at A00017.

Throughout the summer of 1999, Article X neglect

proceedings regarding Plaintiff's birth parents continued.

Def.'s 56.1 ¶ 34; Pl.'s 56.1 ¶ 33.  Consistent with DCP

practice, the assigned DCP caseworker, Niang, appeared in court

for legal proceedings related to the ongoing neglect petition.

Def.'s 56.1 ¶ 28; Pl.'s 56.1 ¶ 27.[14]  On August 19, 1999, during

_____

[12] Defendants have provided the Court with a 48-page memorandum entitled "Revised ACS Policies and Practices in Support of the Risk Assessment UCR," Def.'s Mot. Summ. J. Ex. R., but they have not directed the Court to any specific language within the document that supports their defense. Plaintiffs note that this document "does not provide any policy, procedure or standard for which division of ACS is responsible for monitoring the foster care agency prior to the transfer of the case to OCACM," but they decline to direct the Court to any portions of the document which speak to ACS' responsibilities or practices with respect to UCRs generally. Pl.'s 56.1 ¶ 68.

[13] Neither party has acknowledged this August 6th entry, nor attempted to explain its significance to the Court.

[14] Beyond her appearance at Family Court, the parties disagree as to what actions Niang took on Plaintiff's case during the summer of 1999. Def.'s Reply 56.1 ¶ 82; Pl.'s 56.1 ¶ 82.  Plaintiff alleges that Niang took no action to "monitor the foster home or the foster care agency", whereas Defendants allege that DCP workers typically "did much of the paperwork function of OCACM" during this time. Id.  Defendant does not, however, provide the Court with any specific evidence of actions (beyond attending court) that Niang undertook after the June 29, 1999 conference. Id. Defendants also do not provide the Court with any further facts regarding what the "paperwork function[s] of OCACM" involved. Def.'s Reply 56.1 ¶ 82. In deciding the motions for summary judgment, the Court has adopted Plaintiff's view of the facts and assumed that Niang took no steps beyond appearing in Court to monitor Plaintiff's foster home.

a hearing in New York State Family Court, Family Court Judge

Mcleod made a verbal order for a written report regarding

"injuries to Justin in FC [foster care]." Def.'s Mot. Summ. J.

Ex. M.[15]  The Family Court's record reflects that the report

should address "alleg[ations] of hitting of 4 yr old Justin by

older child in foster home." Def.'s Mot. Summ. J. Ex. L p.

FC000071.  Defendants claim that Judge Mcleod's order was

directed at the St. Christopher's caseworker, whereas Plaintiff

claims that the order was directed at Niang.  Def.'s 56.1 ¶ 34;

Pl.'s 56.1 ¶ 32.  There is contradictory evidence in the record

to support both assertions.[16]  Regardless, both Niang and the St.

Christopher's caseworker were present when the order was issued.

Def.'s Mot. Summ. J. Ex. M.  It does not appear from the record

that Niang or the St. Christopher's caseworker took any action

themselves to investigate the allegations referenced in Judge

Mcleod's August 19th order.  Nor does it appear that either Niang

or the St. Christopher's caseworker referred the case to the

---

[15] There is no evidence in the record, nor has either party provided for the
Court, a deadline for when the court ordered written report was to be
completed. Def.'s Mot. Summ. J. Ex. M.

[16] Compare Def.'s Mot. Summ. J. Ex. M ("written report" listed under "Action
to be taken by ACS") and Def.'s Mot. Summ. J. Ex. N p. 35 (testimony of
Sylvia O'toole in an administrative hearing in response to question: "Did you
follow up with this woman [St. Christopher's caseworker] and ask whether she
contacted the foster mother to talk about it [bruise on Plaintiff's body]".
Answer: "At that time, we went to court and I told the judge. She didn't do
anything, and the judge told her she had to do something but St. Christopher
fired her.")

SCR, the Office of Confidential Investigations ("OCI"), [17] or any other entity for investigation.

On September 4, 1999, Plaintiff's case file was received by the assigned OCACM Unit. Pl.'s 56.1 ¶ 78; Def.'s Reply Rule 56.1 Stmt. ¶ 78. Although the parties disagree as to when the case was assigned to an OCACM caseworker, the first documented contact by the OCACM caseworker occurred on September 21, 1999, when the OCACM caseworker called St. Christopher's. Pl.'s 56.1 ¶¶ 80-1; Def.'s Reply Rule 56.1 ¶¶ 80-1. During the call, the OCACM caseworker discussed with St. Christopher's staff "plan amendments" and a "request to place children together in a kinship foster home." Def.'s Mot. Summ. J. Ex. K pp. A00773. The record does not reflect that there was any discussion between the OCACM caseworker and St. Christopher's regarding concerns about Plaintiff's safety, id., and there is nothing in the record which speaks to ACS' policy on the OCACM caseworker's responsibilities to review and monitor the foster care agency following her receipt of the case file.

On September 27, 1999, Plaintiff went to St. Christopher's for a visit with his family. Id. at A00184-85. During this

---

[17] Although neither party has directed the Court to any facts regarding the process by which cases are referred to OCI, the Court notes that a document entitled "Protection of Children in Foster Care" provided by Defendants states that "[t]he SCR will electronically transmit allegations on accepted reports relating to CWA [Child Welfare Administration] children who are placed in foster boarding homes to OCI for investigation." Def.'s Mot. Summ. J. Ex. V p. C0671.

visit, agency employees observed signs of serious abuse brought
to their attention by the Plaintiff's family.  Id.  Plaintiff
was immediately removed from his foster home, and St.
Christopher's called in a report of abuse to the SCR.  Def.'s
56.1 ¶ 37-38; Pl.'s 56.1 ¶ 36-37, 95; Def.'s Reply 56.1 ¶ 95.
The report was subsequently referred to OCI.  Pl.'s 56.1 ¶ 95;
Def.'s Reply Rule 56.1 Stmt. ¶ 95.  During the course of its
investigation in September 1999, OCI found that Plaintiff had
been seriously abused in foster care.  Pl.'s 56.1 ¶ 93-4; Def.'s
Reply Rule 56.1 Stmt. ¶ 93-4.  Plaintiff had been bruised, hit,
kicked, bitten, and lacerated on multiple parts of his body.
Id.  Plaintiff's stomach was observed to be distended as if it
were bloated and he hadn't eaten.  Id.

       At an unspecified date between the OCI investigation
commencing on September 27, 1999 and the Family Court Hearing on
November 4, 1999, Niang sent an undated letter to Judge Mcleod
stating that "the following material is being forwarded to you
in response to your request for the Administration for
Children's Services to investigate and submit a report in
preparation for a court hearing scheduled for 11-4-99".  Def.'s
Mot. Summ. J. Ex. K pp. A00624-7.  Under the heading "Current
Family Functioning", the letter states, "it was alleged that the
child Justin had sustained scratches from the other children in
the foster home.  The Administration of Children's Services'

14

office of confidential information investigation is still

pending." Id. at p. A00627.[18]

On August 16, 2006, Plaintiff filed suit in this Court,

alleging violations of his constitutional rights.  As previously

noted, settlement was reached with respect to certain of the

Defendants, and default judgment was entered against ACS

employee Niang.  Remaining Defendants and Plaintiff have now

filed cross-motions for summary judgment.  The City has also

filed objections to the damages ordered in Magistrate Judge

Ellis' July 19, 2010 Report and Recommendation.

### MOTIONS FOR SUMMARY JUDGMENT

**A. Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides

that a court shall grant a motion for summary judgment "if the

pleadings, the discovery and disclosure materials on file, and

any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(c).  "The party seeking

summary judgment bears the burden of establishing that no

genuine issue of material fact exists and that the undisputed

---

[18] Although the parties have not provided any facts or guidance to the Court
on this issue, the Court notes that Niang's reference to the "office of
confidential information investigation" appears to be to OCI's investigation
related to the report of abuse made by St. Christopher's on September 27,
1999.  There are no facts in the record regarding how Niang became aware of
this OCI investigation, as she did not have a role in initiating or
conducting it.

facts establish her right to judgment as a matter of law."
Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir.
1995).  The substantive law governing the case will identify
those facts that are material and "[o]nly disputes over facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In
determining whether a genuine issue of material fact exists, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986).
"If, as to the issue on which summary judgment is sought, there
is any evidence in the record from any source from which a
reasonable inference could be drawn in favor of the nonmoving
party, summary judgment is improper."  Chambers v. TRM Copy
Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

### B. Discussion

     After Plaintiff's settlement with St. Christopher's and the
default judgment against Niang, liability of only three
Defendants remains to be determined: the City and its employees,
Greene and Stewart, who were Niang's supervisors at ACS.  The
complaint alleges the following causes of action against these
three Defendants: (1) failure of the City, Greene, and Stewart
to protect and supervise under § 1983 and U.S. CONST. amend. XIV;

16

(2) the City's, Greene's, and Stewart's acquiescence in the excessive use of force under § 1983 and U.S. CONST. amends. IV, XIV; (3) failure of the City to train its employees under § 1983 and U.S. CONST. amend. XIV; (4) failure of the City to supervise under New York common law; and (5) breach by Stewart and Greene of their obligations to carry out social work duties under New York common law.

## 1. Failure to Protect and Supervise

"Section 1983 provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999)." [C]hildren in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm." Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662, 675 (S.D.N.Y. 1996).

### a. Against the City

In order to succeed in a § 1983 claim against the City, Plaintiff must prove that "the alleged constitutional violation was caused by the entity's 'policy or custom.'" Douglas v. City of New York, No. 06 Civ. 6134, 2009 U.S. Dist. LEXIS 8328, at *31 (S.D.N.Y. Feb. 5, 2009) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).

Plaintiff identifies the "policy or custom" at issue as

follows:

> It was ACS policy that, after a child was
> placed in foster care, a case was
> transferred from DCP through a Transfer Unit
> to OCACM, and that OCACM was responsible for
> supervising and monitoring the foster home.
> The transfer process from DCP to OCACM could
> take up to 90 days.  It was ACS policy that,
> after the removal of a child such as Justin
> R. from his home, but prior to the transfer
> of the case to OCACM, DCP did not supervise
> the foster home or monitor the agency's
> performance.

Pl.'s Mem. Law Supp. Mot. Summ. J. Opp. City Def.'s Mot. Summ.

J. 7.  Taking these statements in light of the arguments and

evidence presented by Plaintiff, the Court understands

Plaintiff's claim to be that: as the result of a delay in

transferring the case file to the assigned OCACM caseworker,

there was a 90-day period in which no one in ACS supervised the

foster home or conducted oversight of the assigned foster care

agency.[19]  Plaintiff has therefore alleged two separate but

related practices: (1) a custom of delaying case transfers to

OCACM by 90 days; and (2) a policy of nonfeasance towards foster

---

[19] The Court has taken great pains to understand Plaintiff's claims, but it
should be noted that Plaintiff's counsel's arguments remain extremely
convoluted and opaque.  In evaluating whether Plaintiff can survive summary
judgment, the initial challenge to the Court was identifying the policy or
practice that Plaintiff alleges resulted in the constitutional violation.
The Court has not been assisted in this inquiry by Defendants' counsel, whose
own arguments have been equally lacking in clarity.

care agencies during the transfer period.[20]  The City disputes

both allegations, but it concedes that case file transfers

between DCP and OCACM could take up to 90 days. Def.'s Reply

Rule 56.1 Stmt. ¶ 60.

Following its review of the record,[21] the Court finds that

there are no genuine issues of material fact and the undisputed

facts establish the City's right to judgment as a matter of law

on Plaintiff's causes of action for failure to protect and

failure to supervise.

In reaching this conclusion, the Court notes that it is

horrified and deeply troubled by the abuse Plaintiff endured

---

[20] Needless to say, the alleged policy of nonfeasance would result in a
violation of the City's constitutional obligation to ensure the safety of
foster children in its custody. See Tylena M. v. Heartshare Children's
Servs., 390 F. Supp. 2d 296, 304 (S.D.N.Y. 2005) ("While the City thus
delegates responsibility for the provision of direct foster care services to
private entities, this delegation does not absolve the City of its ultimate
responsibility to ensure that children in its custody receive adequate care
and protection from harm.").

[21] The Court notes that, in light of the lack of clear guidance from the
parties, the Court has had to conduct an extensive review of the underlying
record.  The Court's inquiry has been further complicated by the fact that,
in response to Defendants' failure to produce 30(b)(6) witnesses or provide
responsive documents, Magistrate Judge Ronald L. Ellis has precluded
Defendants from introducing at trial any documents or witnesses to testify to
the following areas:
> 2) [a]ll policies, procedures, and standards of the Administration for
> Children's Services' Transfer Unit which were in effect at any time
> between June 1, 1999, and October 1, 1999, concerning:
> (h) interaction between ACS and the foster care agency;…
> (k) duties of caseworkers or other employees when placing a child in a
> foster home and;…
> (r) transferring case responsibility from the field office and/or the
> transfer units to the Office of Case Management (formerly Office of
> Contract Agency Case Management); and
> (3) Documents which embodied ACS policies, in effect in 1999, regarding
> the transfer of cases from the ACS field offices to the Office of Case
> Management.
Memorandum and Order at 2-3, Justin R., v. Luz Bloise, et al., No 06-CV-6228
(S.D.N.Y. July 2, 2009).

19

while he was in foster care.  Evidence of injury is not on its own, however, sufficient to support Plaintiff's claims under § 1983.  In addition, to the extent Plaintiff must demonstrate that the alleged custom or policy resulted in his injury, Plaintiff's claims are unsupported by the facts in the record.

Since the Court sees the August 19, 1999 Family Court Hearing as a critical event in Plaintiff's case, it has organized its analysis of Plaintiff's failure to protect and supervise claims against the City around this date.  The first part of the Court's analysis addresses Plaintiff's claims regarding ACS' actions or inaction prior to the August 19, 1999 Family Court Hearing.  The second part of the analysis turns to Plaintiff's claims stemming from ACS' actions or inaction on or after the August 19, 1999 Family Court Hearing.

### i.   Claims for Actions Prior to August 19, 1999

With respect to Plaintiff's claims regarding the City's actions or inaction prior to the Family Court Hearing on August 19, 1999, the Court finds that there are no facts in the record to support the causation element of Plaintiff's § 1983 claims for failure to protect and failure to supervise.[22]  Even if the Court assumes Plaintiff's alleged custom of transfer delay and

---

[22] See Burton v. Lynch, 664 F. Supp. 2d 349, 361 n.17 (S.D.N.Y. 2009) ("To find a defendant liable in a § 1983 action, the defendant must be the proximate cause of the constitutional violation alleged.  This entails that a plaintiff must allege facts which, if taken as true, would demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct.") (internal citations omitted).

policy of nonfeasance, the record lacks facts to support a claim that either of these practices resulted in Plaintiff's injuries.

Looking first at the alleged 90-day delay in transferring the case file, the Court finds that there is no evidence to suggest that Plaintiff's injuries would have been prevented or detected sooner had OCACM received the case file at an earlier date.  There are no facts in the record that provide any insight as to OCACM's general policy or practice, nor are there facts which suggest that Plaintiff's specific case file would have prompted further action by OCACM.  As a result, the record contains no facts to support causation.  To the extent that Plaintiff seeks to incorporate into his claims an argument that OCACM's inadequate supervision of the foster care agencies was itself a further policy contributing to the violation, the Court finds these arguments equally unsupported.  The record reveals no evidence that OCACM's supervisory policies were insufficient, or even what OCACM's supervisory policies were.  In essence, the record contains no facts regarding any supervisory acts that at the same time (1) were not taken, (2) were legally required, and (3) would have prevented Plaintiff's abuse.  Given this complete absence of evidence, the Court finds that the record cannot support a claim that Plaintiff's injury would have been avoided or earlier detected had there not been a 90-day delay before the case file reached OCACM.

The Court turns now to Plaintiff's claims regarding the
alleged ACS policy of nonfeasance.  The Court finds that, as
applied to the time period up to the Family Court Hearing on
August 19, 1999, the record does not support Plaintiff's
argument that such an alleged policy caused his injuries.  The
relevant facts in the record prior to August 19, 1999 pertain to
the: 72-Hour Child Safety Conference, St. Christopher's home and
agency visits with the Plaintiff, the Child Evaluation, and the
UCR.  None of the facts related to these events suggest on their
face abuse in the foster home, and Plaintiff has cited no
evidence for the Court to conclude otherwise.  There is nothing
in the Child Safety Conference materials to indicate abuse, and
the case notes from St. Christopher's are similarly
unsupportive.  Although the caseworker recorded in her notes
that Plaintiff cried at the conclusion of his initial visit with
his family, the record contains no evidence suggesting that this
reaction, if it was even atypical, would have prompted further
action had there not been a policy of nonfeasance.  With respect
to the Child Evaluation and the UCR, Plaintiff raises three
issues he deems suspicious: that Justin is at times referred to
as "Justine" (with feminine pronouns) in the Child Evaluation,
that no "medicals" were reviewed for the Child Evaluation
(though they were submitted with the UCR), and that the UCR
states that "there is not enough information about" the case

22

because it was new at the time of the UCR.  Although the Child

Evaluation's use of "Justine" could potentially be evidence of

negligence, and additional medical information could have

strengthened the Child Evaluation, there is nothing in the

record which even remotely suggests that either of these pieces

of information would have led to an earlier discovery of the

abuse had there not been a policy of nonfeasance imposed during

the transfer period.  The fact that the UCR stated that "there

is not enough information about" the case is similarly

insufficient on its own.  The record lacks any evidence that

such preliminary UCRs were unusual or that, had they been

received at a time other than during the transfer period, they

would have prompted a heightened degree of supervision over St.

Christopher's prior to the issuance of the next UCR.

       **ii.   Claims for Actions On or After August 19, 1999**

    With respect to Plaintiff's failure to protect and

supervise claims against the City that arise from ACS' actions

or inaction at or after the August 19, 1999 Family Court

Hearing, the Court finds that there are no facts in the record

to support these causes of action.  To the extent Plaintiff

relies on an alleged custom of transfer delay as a basis for his

claims during this period, even if the Court assumes that this

custom persisted, there are insufficient facts to establish that

a delay in transferring the case caused or resulted in the later

discovery of Plaintiff's injury.  For Plaintiff's claims which
are rooted in the alleged policy of nonfeasance, the Court finds
that the record reveals no facts to support Plaintiff's claim
that ACS had a policy of nonfeasance which resulted in the
agency's failure to take action in response to Judge Mcleod's
verbal order.

As in the Court's analysis of Plaintiff's claims based on a
custom of delayed transfer prior to the Family Court Hearing,
the Court finds that there are no facts in the record to support
the causation element of Plaintiff's § 1983 claims based on any
delayed transfer which occurred on or after August 19, 1999.
Even assuming that the case file was not received by OCACM until
September 21, 1999, [23] and that this delay was the result of ACS'
custom, the record does not support that an earlier transfer to
OCACM would have resulted in a different outcome.  As stated in
the Court's previous analysis, the record is entirely silent as
to OCACM's policies or practices.  Given this, it is pure
speculation that an earlier transfer to OCACM would have
resulted in a different handling of Plaintiff's case.  Indeed,
the only fact in the record regarding OCACM suggests that an
earlier transfer would not have resulted in a different outcome.

---

[23] The parties agree that the case file was delivered to the assigned OCACM
unit on September 4, 1999 but disagree as to when it was assigned to a
caseworker. Pl.'s 56.1 ¶ 80; Def.'s Reply Rule 56.1 Stmt. ¶ 80.  Construing
the facts in the light most favorable to Plaintiff, the Court assumes in its
analysis that the case file was not delivered to the assigned caseworker
until September 21, 1999.

Although the OCACM caseworker received the case file on September 21, 1999, six days prior to the discovery of the abuse on September 27, 1999, the record reflects that OCACM did not take any action to respond to the August 19th order—nor did OCACM take any other action to investigate whether Plaintiff was safe in the foster home.  Given these facts, the Court finds that the record cannot support Plaintiff's claim that a custom of delayed transfers following August 19, 1999 caused his injury or resulted in its later discovery.

The Court turns now to Plaintiff's claims which allege an ACS policy of nonfeasance during the period following the August 19, 1999 Family Court Hearing.  Since these claims rely singularly on ACS' lack of response to Judge Mcleod's verbal order to investigate, the Court's analysis focuses on the agency's response to this order. [24]  Examining the claims, the Court finds that there are insufficient facts in the record to support a claim that the City had a policy or custom which led to its failure to take any action in response to Judge Mcleod's August 19, 1999 order.  Although Niang's failure to take action may have been negligence, a single incident involving an employee below the policymaking level is generally insufficient

---

[24] The Court notes that an argument could be made that Niang's undated letter in advance of the November 4, 1999 Family Court Hearing constituted a response to Judge Mcleod's order.  Construing the facts in the light most favorable to the Plaintiff, however, the Court assumes Plaintiff's view that ACS never responded to the Family Court's August 19th order to investigate the allegations that Plaintiff had experienced abuse in the foster home.

to support an inference of a municipal custom or policy.  Vann
v. City of New York, 72 F.3d 1040, 1050 (2d Cir. 1995) (citing
Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  Beyond
the incident involving Niang, the record reveals no facts to
suggest that the City had a policy or custom of disregarding
orders from the Family Court.  In the absence of such a policy
or custom, Plaintiff cannot support a § 1983 claim against the
City, even if its employee's actions were ultimately negligent.
See Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995)
("A municipality may not be held liable in an action under 42
U.S.C. § 1983 for actions alleged to be unconstitutional by its
employees below the policymaking level solely on the basis of
respondeat superior.")  The Court therefore finds that the facts
in the record cannot support Plaintiff's claims relating to the
City's alleged policy of nonfeasance from August 19, 1999 (the
date of the Family Court Hearing) until September 27, 1999 (the
date the abuse was ultimately discovered).

### b. Against Greene and Stewart

"To establish the liability of a supervisory official under
§ 1983, a plaintiff must show the defendant's personal
involvement in the alleged constitutional violations."
Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (citation
omitted).  For an individual to be liable for failure to
supervise,

that person must have (1) failed "to remedy a wrong after being informed through a report or appeal," (2) created a policy or custom "that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue," (3) was "grossly negligent" in supervising "subordinates who committed a violation," or (4) failed "to act on information indicating that unconstitutional acts were occurring."

Richards v. City of New York, 433 F. Supp. 2d 404, 428 (S.D.N.Y. 2006) (quoting Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003)).

Since only Niang was present at the August 19, 1999 Family Court proceeding, the documentary record reflects only her knowledge of Judge Mcleod's order.  Although the parties agree that Greene and Stewart were in Niang's supervisory chain, Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26, the record contains no facts suggesting that Greene or Stewart personally knew of the order to investigate, personally created any City policy, or personally had any information indicating that Plaintiff was being abused.  While Plaintiff asserts that Greene and Stewart did nothing at all, Pl.'s Reply 9, the record lacks any evidence as to what Greene's and Stewart's personal responsibilities were such that they might be found grossly negligent with respect to their responsibilities.

### 2. Excessive Use of Force

As in Tylena M., "Plaintiff[] do[es] not specify the facts underlying his excessive force claim."  390 F. Supp. 2d at 310.

27

This Court will similarly "presume[] that Plaintiff[] intend[s] to plead this cause of action against . . . Defendants for failing to prevent" Plaintiff's foster parents from abusing him. Id. "Although excessive force claims generally allege the use of force by governmental authorities, they may also be brought against public officials for failing to prevent private persons from using excessive force." Id. (citing Armster v. City of Riverside, 611 F. Supp. 103, 107 (C.D. Cal. 1985)). Recognizing this, the analysis of the excessive use of force claim is identical to that of the failure to supervise claim. See Tylena M., 390 F. Supp. 2d at 310-11.

### 3. Failure to Train

Plaintiff argues that the City failed to train its employees–specifically Greene, Stewart, and Niang–adequately. "The Supreme Court established in City of Canton that a municipality can be liable for inadequately training its employees where the municipality is deliberately indifferent toward whether its employees will unconstitutionally apply its policies without more training." Richards, 433 F. Supp. 2d at 428-29 (citing City of Canton v. Harris, 489 U.S. 378, 387-90 (1989)). "The deficiency in the training program must be 'closely related to the ultimate injury,' such that it 'actually caused' the violation of constitutional rights." Id. (quoting City of Canton v. Harris, 489 U.S. at 391).

28

Here, there are no facts in the record to support Plaintiff's claim that a lack of training "actually caused" the ultimate injury.  Plaintiff cites to no evidence that a lack of training caused ACS to delay its compliance with the August 19, 1999 court order to investigate, and there are no facts to support a claim that with additional training Greene, Stewart, or Niang would have detected Plaintiff's abuse earlier.

### 4. State Law Claims

The Court declines to exercise supplemental jurisdiction over any of Plaintiff's remaining state law claims.  28 U.S.C. § 1367(c)(3).  Accordingly, Plaintiff's remaining state law claims are DISMISSED without prejudice.

### REPORT AND RECOMMENDATION

The Court is aware that the City has filed Objections to the damages recommendation made by Magistrate Judge Ronald Ellis in his July 19, 2010 Report and Recommendation.  The parties are directed to appear at a hearing before the Court for oral argument on the City's Objections to the Report and Recommendation.

### CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

The parties are ordered to appear before the Court in Courtroom 17C at 500 Pearl Street, New York, New York for oral argument on the City's Objections to the Magistrate Judge's Report and Recommendation on November 8, 2011 at 3:00 PM.


SO ORDERED:

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE


Dated:     New York, New York
           October 5, 2011